# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6837 | **DATE** | 7/26/2002 |
| **CASE TITLE** | Mae Campbell vs. William Henderson, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 10-1) is granted. Judgment is entered in favor of Defendant and against Plaintiff Mae Campbell.

(11) ■ [For further detail see

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 29 2002 | |
| | Notified counsel by telephone. | | date docketed | 18 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 7/26/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | 02 JUL 26 PM 4:49 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

DOCKETED
JUL 29 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAE CAMPBELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 00 C 6837 |
| | ) |
| WILLIAM HENDERSON, | ) Judge Rebecca R. Pallmeyer |
| POSTMASTER GENERAL | ) |
| OF THE UNITED STATES, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mae C. Campbell, a Postal Service employee, filed this suit against the United States Postmaster General, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*[1] Specifically, Plaintiff alleges that she was retaliated against for having filed complaints of discrimination and for otherwise opposing discrimination. Defendant now moves for summary judgment, arguing that it took no adverse action against Plaintiff and that Plaintiff cannot establish a prima facie case of retaliation. For the reasons given below, the motion for summary judgment is granted.

## FACTS

Plaintiff has worked as an occupational health nurse for the United States Postal Service at the main post office in Chicago, Illinois since 1975. (Plaintiff's Local Rule 56.1 Statement in Opposition to Defendant's Statement of Material Facts ("Pl.'s Rule 56") ¶ 3; Compl. ¶ 5.) At all times relevant to this action, Plaintiff's immediate supervisor was Joseph Ellis, Occupational Health Nurse Administrator. (Pl.'s Rule 56 ¶ 4; Plaintiff's Deposition ("Pl.'s Dep."), at 7-8, Exhibit 2 to Defendant's Exhibits in Support of its Motion for Summary Judgment ("Def.'s Exs.").) Plaintiff

---

[1] John E. Potter has succeeded William Henderson as Postmaster General and, therefore, is properly substituted as a defendant in this matter. See FED.R.CIV.P. 25(d)(1).



alleges that Ellis discriminatorily denied her requests for leave, attempted to discipline her in May 1996 and January 1998, delayed her injury compensation, and repeatedly wrote her up without justification in retaliation for her opposition to discrimination. (Compl. ¶¶ 12, 16.) Plaintiff filed a series of complaints with the EEOC, charging sex, race, color, religion, age, and disability discrimination and retaliation but subsequently dropped all claims but the claim of retaliation. (Compl. ¶ 4; Defendant's Answer ("Ans. ¶ 4").) On or about August 8, 2000, Plaintiff received a notice of final agency action and notification of her right to file an action in federal district court within 90 days.[2] (Id.) She filed this action on November 1, 2000.

Plaintiff previously filed an action in the United States District Court, alleging discrimination by another supervisor, Dr. Gerald Joynson.[3] (Id. ¶ 7.) Plaintiff also alleges having filed more than ten EEOC complaints on her own behalf and as union steward for others.[4] (Pl.'s Dep., at 177; Plaintiff's Answers to Defendant's First Set of Interrogatories ("Pl.'s Ints.") ¶ 1c.) Plaintiff asserted further that as her supervisor, Mr. Ellis customarily learned whenever she filed or assisted others

---

[2] The record before the court does not include copies of any of the materials that Plaintiff filed with or received from the EEOC. As cited by the parties, Plaintiff's EEOC case numbers were 4-J-606-0115-98 and 4-J-606-1196-96.

[3] Although Plaintiff alleges that her complaint was filed in 1995, the only relevant case located by the court is a 1993 employment discrimination suit that Plaintiff filed against the United States Postal Service alleging gender-based discrimination by a Dr. Gerald Jonsyn, chief medical officer of the medical unit in the Chicago division of the Postal Service. See Campbell v. Runyon, No. 93 C 6571, 1994 WL 329744 (N.D. Ill. July 7, 1994). It is unclear whether the doctor's name was spelled incorrectly in the past litigation or in the current record.

[4] The record does not include copies of these complaints. Plaintiff's own descriptions are less than clear. In response to an interrogatory asking her to identify "the date and nature of the protected activity that allegedly motivated the responsible individual to retaliate against plaintiff," Plaintiff responded:

> Grievances file and work jurisdiction 1991-1998 til present, EEO filed and assisted Nancy Coffin RN/Transfer to Injury Compensation 1992-1993 Barbara Conner RN/Contract Nurse worked at BMC in a closed medical Unit form 1992-til present still open and staffed by contract nurses. Joseph Ellis retried OHNA was hired two weeks ago to work at this same facility that was part of the David Vaughn work jurisdiction Grievance USPS/NPPN was found in violation of the NPPN National Agreement 1991-til present assisted other postal employees with EEO complaints.

(Pl.'s Ints. ¶ 1c.) (verbatim transcription).

2

in filing complaints, but she offers no evidence in support of that assertion.[5] (*Id.*, at 180-81.)

## A. Denials of Leave

Postal employees are allowed to take annual leave for vacation purposes or sick leave for medical reasons. (9/11/01 Declaration of John L. Richardson, Postal Service Manager of Human Resources ("Richardson Decl.") ¶ 4.) Plaintiff alleges that Ellis improperly denied her leave on three separate occasions. First, in April 1996, Plaintiff initially submitted a request for annual leave to take an Occupational Health Exam on April 25.[6] (Letter from Ellis to Campbell of 4/24/96 ("April 1996 Ellis Letter"), Ex. 4 to Def.'s Exs.; Richardson Decl. ¶ 5.) For reasons disputed by the parties, Ellis denied the request for annual leave. (*Id.*) Plaintiff's submissions are less than a paragon of clarity, but she appears to contend that her request was denied because she had filed earlier EEOC complaints that displeased Ellis and the Post Office.[7] (Pl.'s Rule 56 Additional Facts ¶¶ 39, 40.) Defendant denies this allegation, and notes that Ellis's April 24, 1996 letter to Plaintiff memorializes a prior denial of the annual leave request on the ground that Plaintiff was needed at work on April 25. (April 1996 Ellis Letter; Letter of Warning from Ellis to Campbell of 5/9/96 ("May 1996 Ellis Letter"), Exhibit 7 to Def.'s Exhs.; Richardson Decl. ¶ 5.) On April 23, after her request for annual leave had been denied, Plaintiff submitted a request for 16 hours of sick leave on April 24 and April 25. (Request or Notification of Absence of 4/23/96 ("April 1996 Medical Leave Request," Ex. 5 to Def.'s Exs 1996; April 1996 Ellis Letter.) Plaintiff did not appear for work on April 24 or 25. In the letter recording the denial of Plaintiff's annual leave request, Ellis also disapproved the request for sick leave pending medical substantiation of Plaintiff's inability to work on those

---

[5] Plaintiff testified that "when you file an EEO complaint, the information gets back to your supervisor and they know it's you" and asserted, without any specifics, that "[Ellis] was always making remarks about whatever had been filed" (Pl.'s Dep. at 180), but she has submitted no evidence showing that Ellis knew of any particular EEO complaint.

[6] The record discloses neither the nature of this examination nor Plaintiff's purpose for undergoing it.

[7] As noted, Plaintiff has not submitted any of the EEOC complaints which she claims to have prepared or assisted in preparing.

3

days. (*Id.*; Richardson Decl. ¶ 5; April 1996 Medical Leave Request.) Plaintiff submitted medical documentation from Dr. Bonifacio Rivera, dated April 29, 1996 and stating only that Plaintiff was "under [his] care" on April 24 and April 25, 1996 and was able to return to work on April 26.[8] (Rivera Family Practice Letter of 4/29/96, Ex. 6 to Def.'s Exs.)

On the second date in question, May 13, 1996, Plaintiff again failed to attend work as scheduled. (Request or Notification of Absence of 5/17/96; Ex. 8 to Def.'s Exs; Richardson Decl. ¶¶ 9-10.) The parties dispute whether this leave was scheduled in advance or not. Although no copy of the written request has been produced during discovery or found in either the EEO file or the grievance file (Richardson Decl. ¶ 16.), Plaintiff insists that she scheduled the annual leave in advance and submitted a copy of the form (apparently her only one) to the EEO. (Pl.'s Dep., at 41-51.) Plaintiff states that she had previously scheduled leave time for the work days prior to May 13 and needed to schedule an additional day of annual leave because of problems getting a flight back from her son's Air Force base graduation in North Dakota. (Pl.'s Dep., at 15-20.) On May 21, 1996, Plaintiff was suspended for seven days for missing work without leave on May 13, 1996. (Notice of Suspension of 5/21/96, Ex. 9 to Def.'s Exs.) The suspension was issued by Ellis and approved by John Richardson, Installation Head. (*Id.*)

The third controverted absence occurred in 1998, when Plaintiff missed work from January 5 through January 12. (Requests or Notifications of Absence of 1/5/98-1/12/98 ("1998 Absence Notifications"), Ex. 10 to Def.'s Exs.; Richardson Decl. ¶ 12.) The leave was neither scheduled in advance nor approved: Plaintiff called in to request medical leave on January 5 and then called in to request annual leave each of the other days. (Richardson Decl. ¶ 12; Pl.'s Dep., at 74.) She made each of these requests shortly before or on the day for which she sought leave. (*Id.*) Ellis denied these requests for leave pending submission of medical documentation for

---

[8] The record before the court does not indicate whether Campbell took the Occupational Health Exam.

4

Plaintiff's absence.[9] (1998 Absence Notifications.) Upon her return to work, Plaintiff submitted notes from two doctors: in the first, dated January 6, 1998, Dr. Rivera stated that he treated Plaintiff for hypertension on January 5, 1998; in the second, dated January 7, 1998, Dr. Raghu Ramadurai stated that Plaintiff's husband was "in . . . for a follow-up" that day "for the treatment of coronary artery disease and hypertension." (Doctors' Notes, Ex. 11 to Def.'s Exs.) On January 14, 1998, Ellis wrote Plaintiff a letter advising her that if proper medical documentation were not submitted to substantiate her absence, her leave would be denied and disciplinary action would result. (Letter from Ellis to Campbell of 1/14/98, Ex. 12 to Def.'s Exs.) The letter stated that the medical documentation already provided was not sufficient to prove she was "unable to work" for the time she was absent. (Id.)

Plaintiff challenged the actions taken by Ellis in April 1996, May 1996, and January 1998 through the internal grievance process available under the Postal Service collective bargaining agreement. (Richardson Decl. ¶ 15.) In response to the grievances, the Postal Service rescinded the discipline, paid Plaintiff for the work hours lost due to the suspension and removed the discipline from her file. (Richardson Decl. ¶ 17; Letter from Carl Weise to Idell Mitchell of 11/1/96 rescinding 5/9/96 letter of warning, Ex. 14 to Def.'s Exs.; Letter from Carl Weise to Idell Mitchell of 11/1/96 rescinding suspension, Ex. 15 to Def.'s Exs.; Letter from Henrietta Johnson to Idell Mitchell of 6/24/98, Ex. 16 to Def.'s Exs.)

**B.    Ellis's Statements**

Plaintiff testified that Ellis told her the "powers that be" had given him authority to do whatever he wanted to get her fired. (Pl.'s Dep., at 151.) Plaintiff has not specified when Ellis

---

[9] As noted, Plaintiff initially requested medical leave only for January 5, 1998 and sought annual leave for all of the other missed days. The record does not indicate why both Plaintiff and Ellis ultimately treated the annual leave requests as medical leave requests. Plaintiff testified that she had the choice of selecting either annual or sick leave for the days in question (Pl.'s Dep., at 74), and the court notes that unlike annual leave, a previously unauthorized medical leave could be justified retroactively with a proper doctor's note. (May 1996 Ellis Letter.)

5

made these statements, other than to indicate that they were made repeatedly after Plaintiff assisted in the filing of some grievances in 1992. (*Id.* at 151-56.) Plaintiff acknowledged that no one witnessed Ellis making these statements to her. (*Id.* at 154-55.) Plaintiff also testified that "from the time he became head nurse [in 1985 or 1986] until the time that he retired out of the post office" [in 2000], Ellis told her more than one hundred times that he intended to move the typewriter out of the office because she was filing too many grievances and EEO complaints.[10] (*Id.* at 8, 157-158.) Plaintiff alleges further that at an unspecified date, Ellis "took the typewriter I used to process grievances and discrimination complaints and said he was taking it because I filed too many grievances and EEO complaints." (Pl.'s Ints. ¶ 1.) There is no evidence of what work-related functions, if any, required the use of a typewriter, but neither party has suggested that Mr. Ellis compromised the work of the occupational health unit by removing the typewriter.

Plaintiff admitted in her deposition that only the two alleged repeated statements attributed to Ellis evinced a motive to retaliate against her. (*Id.* at 166-67.) She nevertheless presents another statement as an additional fact in her Local 56.1 statement as well as in her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment: Specifically, Plaintiff asserts in those filings that Ellis told her that management was specifically disturbed because of an EEO complaint she had filed in the district court against Dr. Gerald Joynson.[11] (Pl.'s Rule 56 Additional Facts ¶ 40.)

### C. Other Work Conditions[12]

Plaintiff makes three other allegations against Ellis. First, she claims that Ellis caused injury

---

[10] The record before the court indicates that the typewriter in question "was located in the unit where [Plaintiff] worked" but does not indicate whether it was assigned exclusively to Plaintiff or to all of the nurses in the unit or whether it was used for any work-related functions.

[11] Plaintiff has not indicated where or when Ellis made this statement, or whether anyone else witnessed him making it.

[12] Because Plaintiff's EEOC charge is not part of the record, the court is unable to determine whether Plaintiff addressed the controverted work conditions in her charge or filed the charge within 300 days of the alleged events.

6

compensation claims to be "held up" after Plaintiff injured her shoulder falling over office electrical cords in November of 1997. (Pl.'s Rule 56 Additional Facts ¶ 48; Pl.'s Dep., at 110-15.) Plaintiff has still not been paid for her injury compensation claims from that injury. (Pl.'s Rule 56 Additional Facts ¶ 48.) In her deposition, Plaintiff claimed that Ellis contacted the injury compensation department as well as the hospital where she was treated after the fall. (Pl.'s Dep., at 110-15.) She has no non-hearsay evidence in support of this claim, however; she offers only her own account of a statement purportedly made by a nurse that Plaintiff had "to work sick or injured because [her] supervisor called over here and demanded that [she] be returned to work immediately." (Id. at 124.)

Plaintiff alleges further that Ellis refused to honor doctor's restrictions regarding work limitations as a result of this injury, an allegation that Defendant denies. The record contains no documentation of any restrictions, nor is there any evidence that Ellis was advised of them. Plaintiff asserts that she was not to do any prolonged walking, prolonged standing or any lifting. (Id. at 119.) Although no specific instances of failure to honor the doctor's restrictions were presented in the record, Plaintiff claims that in circumstances where she was working alone without an assistant, then she would "have to do all the pushing and take care of all the emergencies." (Id.)

Finally, Plaintiff alleges that Ellis repeatedly wrote her up without justification from April 1996 forward. (Id. at 127-28.) The record contains no write-ups other than those previously discussed in connection with leave allowances.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

7

of law. FED.R.CIV.P. 56(c); *see also Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002). In determining the existence of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001). The Seventh Circuit has noted that "courts should be careful in a discrimination case . . . not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Nonetheless, even when issues of motive and intent are involved, summary judgment may be appropriate if the plaintiff fails to present evidence demonstrating the alleged motive of intent to discriminate. *See Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir. 1994); *see also Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001).

Campbell claims that Ellis unlawfully retaliated against her because she filed discrimination complaints and otherwise opposed discrimination. Title VII prohibits retaliation against any employee who has engaged in activity protected by the Act. 42 U.S.C. § 2000e-3(a). Because she does not have direct evidence of retaliation, Plaintiff here can oppose summary judgment by pointing to evidence that 1) she engaged in statutorily protected expression; 2) she suffered an adverse action by her employer; and 3) there is a causal link between the protected expression and the adverse action. *See Mathur v. Board of Trs. of Southern Ill. Univ.*, 207 F.3d 938, 941-42 (7th Cir. 2000). In order to demonstrate the "causal link," the plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the protected expression. *Johnson v. University of Wis. Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995).

Campbell also asserts that Ellis retaliated against her in violation of Title VII by subjecting her to a hostile work environment through a pattern of continual and persistent tampering with her

leave time, her ability to observe doctor's limitations, and her workers' compensation rights.[13] Although Plaintiff failed to raise her hostile environment claim until her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, the court considers it here within the context of retaliatory harassment for plaintiff's protected activity. Retaliatory harassment by a supervisor can rise to the level of an adverse employment action if it is severe enough to cause a significant change in the plaintiff's employment status. *Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001).

Because there is no dispute that Campbell's participation in EEOC complaints was protected activity, the court begins by considering whether a jury could reasonably find that Campbell suffered an adverse employment action. Whether an employee has suffered a materially adverse employment action will normally depend on the facts of each situation. *Bryson v. Chicago State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996). The Seventh Circuit has defined "adverse employment action" quite broadly: The term is not limited solely to loss or reduction of pay or monetary benefits, but can encompass other forms of adversity as well. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Nevertheless, "not everything that makes an employee unhappy is an adverse action." *Id.* Negative performance reviews, a change in job title, or an increased travel distance to work do not by themselves qualify. *Hill v. American Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000). In order to constitute a materially adverse change in the terms and conditions of employment, the change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). The adverse action must have some tangible job consequence, *see Sweeney v. West*,

---

[13] Although Campbell invokes the language of sexual harassment claims in decrying the "hostile working environment" allegedly created by Ellis, it is clear that this part of her claim addresses retaliation rather than sexual harassment or other forms of discrimination. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, at 5. Campbell discusses the alleged "pattern of harassment" in the context of arguing that she had suffered an adverse employment action.

149 F.3d 550, 556 (7th Cir. 1998), such as termination of employment; demotion evidenced by a decrease in wage or salary, or a less distinguished title; a material loss of employment benefits; or significantly diminished material responsibilities. See Crady, 993 F.2d at 136.

Specifically, Plaintiff alleges that (1) Ellis caused Plaintiff's claims for injury compensation to be delayed; (2) Ellis repeatedly wrote Plaintiff up without justification; (3) Ellis refused to honor doctor's restrictions on Plaintiff's work at the end of 1997; (4) Ellis denied her requests for leave because she was filing too many EEO complaints; (5) Ellis told Plaintiff that management was specifically disturbed because of the EEO complaint she filed with District Court against Dr. Gerald Joynson; (6) Ellis told Plaintiff that the "powers that be" had given him authority to do whatever he wanted to do to get her fired; and (7) Ellis told her on more than 100 occasions that he was going to move the typewriter out of the office because she was filing too many grievances and EEO complaints.

### 1.     Workplace Conditions Claims

To begin, Plaintiff's allegations regarding Ellis's conduct in delaying her injury compensation claims and repeatedly writing her up without justification are non-starters. First, Plaintiff has no admissible evidence to support her allegation that Ellis caused her injury compensation claims to be delayed: She offers only an unsupported assertion that Ellis called a postal unit injury compensation worker. See Pl.'s Dep., at 113 ("I don't know what [Ellis] said [to the postal injury compensation worker], but whatever it was, the information that I submitted to injury comp in relationship to my injury, it never got processed.") Nothing on the record indicates that Plaintiff has any personal knowledge that Ellis had any communication on the matter at all, let alone that he threatened to or proceeded to impede her claims. Put differently, Plaintiff's uncorroborated statement does not support an inference that Ellis caused the problem of which Plaintiff complains.

Second, with regard to the allegedly unjustified write-ups, Plaintiff has failed to specify which

write-ups she is referring to or why she believes them to have been unjustified. To the extent the court can infer from the record, the controverted write-ups appear to have pertained to Campbell's unexcused absences from work. Because, as explained below, the court concludes that Plaintiff did not suffer a materially adverse employment action from the disciplinary actions Ellis initiated after Campbell's unexcused absences, it necessarily follows that the write ups related to the actions are not materially adverse either.

Campbell also alleges that in late 1997 and early 1998, Ellis disregarded medical restrictions that she received after a fall. Plaintiff fails to make her prima facie case on this claim. To begin, her allegations regarding the adversity of Ellis's alleged employment action are paper thin. Plaintiff fails to specify when her doctor's note was submitted, or how Ellis refused to honor it. In fact, Plaintiff has submitted no evidence that Ellis was ever aware of the restrictions. When asked what restrictions Ellis failed to honor, Campbell responded:

> The doctor didn't want me to do prolonged walking. He didn't want me to do prolonged standing. He didn't want me to do lifting.
> So if I was working alone and [Ellis] never gave me an assistant, then I have to do all the pushing and take care of all the emergencies.

(Pl.'s Dep., at 119.) Even if this testimony permits the inference that Campbell suffered an adverse employment action--assuming, that is, that Ellis failed to provide an assistant and that his failure constituted a violation of doctor's restrictions previously-submitted by Plaintiff--the court concludes that Plaintiff has failed to provide evidence sufficient to show a causal connection between this action and Plaintiff's protected conduct. First, Plaintiff has provided no evidence that would directly link Ellis's alleged conduct with retaliation: she does not allege that he reminded her of her complaint while disregarding the restrictions, for example. Further, Plaintiff has provided no evidence detailing the chronology of her complaints and Ellis's alleged conduct. In other words, from the record before the court, it is impossible to discern how much time elapsed between Plaintiff's participation in EEOC complaints and the alleged failure to honor medical restrictions.

To cite just one example, Plaintiff's broad allegation that she assisted in complaints over the period ranging from 1991 to the present permits the inference that she participated in complaints in 1991, long before she obtained her medical restrictions, and in 1999, well *after* Ellis's alleged conduct.

Plaintiff's lack of chronological specificity is important, because it is well-settled law that the longer the interval between a protected expression and an adverse employment action, the weaker any inference of causation becomes. *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001). Where, as here, the only evidence of causation is temporal proximity, the Seventh Circuit has repeatedly declined to draw causal inferences from even brief intervals. *See, e.g., Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) (one-year lapse between expression and employment action too attenuated); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight months); *Juarez v. American Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (six months); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (four months); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (three months). Plaintiff presents no evidence bearing on the question of whether the interval in her case was sufficiently brief to permit an inference of causation. Similarly, the sparse record before the court leaves open the question of whether Plaintiff must overcome the Seventh Circuit's conclusion that a "substantial time lapse . . . is counter-evidence of any causal connection." *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995). For the reasons given, Plaintiff's workplace conditions claims cannot withstand summary judgment.

### 2. Denial of Leave Requests

The court now turns to Campbell's next claim: that Ellis' denial of leave requests in April 1996, May 1996 and January 1998, and the disciplinary actions after her May 1996 and January 1998 absences were materially adverse retaliatory actions.

12

As an initial matter, Campbell cites no case law on whether the denial of requests for annual or sick leave constitutes an adverse action. The court need not reach this issue, however, because the disciplinary actions taken by the post office (one suspension and two letters of warning) were ultimately rescinded through internal grievance procedures. In light of the rescissions, Plaintiff suffered no material adverse change in the terms, conditions or privileges of her employment; in effect, she received retroactive leave approval for the days in question without any accompanying penalty or punishment. *See Lyon v. Bell Atl. Corp.*, No. Civ. JFM-99-3631, 2001 WL 826580 (D. Md. July 19, 2001) (rescinded suspension from work did not constitute adverse employment action); *Despanie v. Henderson*, No. C 00-3028 CRB, 2001 WL 253213, at *6 (N.D. Cal. Feb 28, 2001) (postal employee could not demonstrate adverse action after letter of warning was rescinded and removed from his file); *Koschoff v. Henderson*, No. Civ. A. 98-2736, 1999 WL 907546, at *13 (E.D. Pa. Oct. 7, 1999) (letters of discipline and suspension no longer in postal worker's employment record did not constitute materially adverse employment actions). Moreover, Plaintiff has not alleged that Ellis's efforts to discipline her resulted in any lingering negative effects.

Even if the disciplinary actions had not been rescinded, the facts as presented would not support a claim for retaliation. Postal employees are allowed to take sick leave or medical leave each year, but any leave must be scheduled or approved in advance by a supervisor. (Richardson Decl. ¶ 4.) In provisionally denying Plaintiff's sick leave requests, Ellis was simply following Post Office procedure as set out in the Postal Employee Labor Relations Manual (ELM), which conditions medical leave on the submission of documentation that the employee is (or was) unable to perform normal duties during the period for which leave is sought. (Richardson Decl. ¶ 8, citing ELM ¶ 513.364.) Plaintiff submitted a doctor's note stating that she was "under. . . care" for the dates of her first unexcused absences in April 1996, but the ELM specifically provides that, "Normally, medical statements such as 'under my care' or 'received treatment' are not acceptable evidence of incapacitation to perform duties." (*Id.*) Similarly, the medical documentation for

Plaintiff's January 1998 absence did not establish that she was incapacitated to perform her work duties for the period from January 5 through January 12. At most, the two notes establish that she was unable to work on January 5, when Dr. Rivera treated her for hypertension, and January 7, when she accompanied her husband to a doctor appointment. The two notes do not establish that she was unable to work for the remainder of the time she was absent. Because Ellis's actions appear to have been entirely consistent with the ELM, the court concludes that Plaintiff has not met her burden of establishing that Defendant would not have taken disciplinary action against Plaintiff but for her protected activity.

For similar reasons, Plaintiff's claims regarding the denial of annual leave also fail. Such a denial does not constitute an adverse employment action. *See Rice v. Central DuPage Hospital*, No. 96 C 2405, 1999 WL 199241, at *5 (N.D. Ill. Mar. 31, 1999)(denial of a vacation request not a material loss of benefits); *Wilkosz v. Hudson Respiratory Care, Inc.*, No. 99 C 309, 2000 WL 1705252, at *10 (N.D. Ill. Nov. 14, 2000) (following *Rice*). In the case at hand, as in *Rice*, it is undisputed that the supervisor had the authority to deny the vacation request. *Id.* Although Plaintiff alleges three denials of vacation requests, two more than was alleged in *Rice*, this court is not persuaded that even three denials would constitute a material loss of benefits. Plaintiff does not suggest that Ellis refused all her requests for vacation leave; notably, Plaintiff was on vacation immediately before her controverted absence on May 13, 1996. In any event, Campbell has not cast any doubt on Ellis' explanation that Campbell was needed at work on one of the days that she sought leave.

### 3. Ellis's Statements

Finally, Plaintiff proffers three statements made by Ellis as evidence of either direct or indirect retaliation. As summarized in Plaintiff's answer to interrogatories, "Ellis said . . . that because I had filed an EEO action against Dr. Gerald Joynson causing him to have to leave and

disrupt his program, the plan was to close the medical unit and get rid of the nurses." (Pl.'s Ints. ¶ 1a.) Although the parties have not briefed the issue, Plaintiff's vague assertion that Ellis made this comment "on numerous occasions, the specific dates I do not remember" (Id.), raises significant questions about the timeliness of this part of Plaintiff's claim. The second statement--that the "powers that be" had given Ellis authority to do whatever he wanted to get Campbell fired–might well be interpreted as a threat against Plaintiff. The final statement, allegedly made on more than 100 occasions, that Ellis was going to move the typewriter out of the office because Plaintiff was filing too many grievances and EEO complaints, specifically criticized protected employee activity.[14] Plaintiff provides no specifics about the dates, times, places, or circumstances in which they were made.

As unpleasant as the alleged comments may have been, they do not constitute the kind of tangible job consequences that the Seventh Circuit has required plaintiff employees to demonstrate in their retaliation actions. In a recent case, for example, an employee alleged that she had been threatened with termination for preparing, submitting, and failing to withdraw a complaint, and that she had received calls at home predicting that her family would suffer if she did not withdraw her complaint. *Rizzo v. Sheahan*, 266 F.3d 705, 718 (7th Cir. 2001). The *Rizzo* court affirmed a

---

[14] Neither threatening to remove nor removing Plaintiff's typewriter constitutes a materially adverse employment action. *See Place v. Abbott Lab., Inc.*, 215 F.3d 803, 810 (7th Cir. 2000) (employee's complaints about losing her telephone and cubicle were "too trivial to amount to an adverse employment action"); *Virostek v. Liberty Township Police Dep't/Trs.*, 14 Fed. Appx. 493, Nos. 99-3809 and 99-3893, 2001 WL 814933, at *7 (6th Cir. July 11, 2001) (unpublished opinion) (supervisor's failure to provide typewriter to female officer was not adverse employment action). *See also Gold v. Gallaudet College*, 630 F.Supp. 1176, 1189 (D. D.C. 1986) (supervisor's conduct in restricting employee's typewriter use was not retaliatory). Further, as noted earlier, Plaintiff has submitted no evidence that the typewriter was used for any work purposes, and the fact that Ellis physically removed it at some point suggests it lacked any work function. The fact that her supervisor removed a *non-work-related* piece of equipment from the office, presumably in the interest of boosting office productivity, does not support a claim for retaliation merely because Plaintiff had used the equipment for preparing complaints. Even without a typewriter at hand, Plaintiff would presumably have remained free to prepare and file complaints on her own time.

15

summary judgment against the employee's retaliation claim because she had failed to show that she suffered a materially adverse employment action. Similarly, in the case at hand, Campbell has not alleged that Ellis ever even initiated proceedings to fire her, reduce her wages, or diminish her job responsibilities. In sum, the terms and conditions of Campbell's employment were not altered in a way that can be characterized as materially adverse.

## **CONCLUSION**

For the foregoing reasons, this court grants Defendant's Motion for summary judgment (Doc. No. 10-1).

ENTER:

Dated: July 26, 2002

REBECCA R. PALLMEYER
United States District Judge

16